**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF VIRGINIA**
**Alexandria Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:25-CR-155** |
| | ) | |
| **SABA DOVLATABADI,** | ) | **Honorable Michael S. Nachmanoff** |
| | ) | |
| **Defendant.** | ) | **Sentencing: September 11, 2025** |

**DEFENDANT'S CORRECTED[1] SENTENCING MEMORANDUM**
**REDACTED**

## I. Introduction

Saba Dovlatabadi is, above all else, a caring and present father, husband, and uncle. He is a selfless son to his elderly parents and a committed mentor to many. He stands before this Court humbled, remorseful, and deeply aware of the consequences of his actions. He does not contest the seriousness of possessing unregistered silencer components, nor does he seek to minimize the legal obligations he failed to meet. Rather, he comes before this Court asking for a sentence that reflects the whole of his life: a life defined not by shortcuts or poor judgment, but by perseverance through adversity, devotion to family, mentorship of young professionals, and contributions to community and country. A sentence of probation fulfills the statutory purposes of sentencing in this case.

For a short period, Mr. Dovlatabadi was also a gun enthusiast who found relief from the mounting stressors in his life in collecting firearms and target shooting on a friend's rural property. Until the events leading up to his arrest, his guns and silencers were all purchased and maintained legally. He sought and received concealed-carry permits from Virginia and Alabama.

---

[1] See page 3: The bold and underlined words "register" and the phrase "passed in the past" are the only corrections to Defendant's Sentencing Memorandum.

He has educated himself in gun safety and has no criminal record. But in January 2024, he cut corners to save time and money. Instead of purchasing $900 silencers and a $200 tax stamp for each one, he purchased them cheaply from China. Saving time and money is how Mr. Dovlatabadi came to be a felon. It is a decision that he regrets every day.

When the local gun store notified Mr. Dovlatabadi about an inquiry from federal agents, he immediately called and emailed the agents, answered their questions and offered to bring his collection of firearms for them to inspect. When agents later searched Mr. Dovlatabadi's home, they found unused, unregistered silencer parts that could be assembled into three complete silencers. They also found Mr. Dovlatabadi's legally possessed firearms collection in his office closet which he could lock, including three registered silencers.

Mr. Dovlatabadi has taken full responsibility for his choices. He reached out to and spoke to the agents. He waived indictment and pleaded guilty to possessing the unregistered items. The government agrees that Mr. Dovlatabadi never intended to sell any of the items and that he was not planning any crime other than their possession. The sentencing guidelines illustrate that the Commission simply did not contemplate that an otherwise law-abiding gun-enthusiast with Mr. Dovlatabadi's personal characteristics would cross a line with no intention to commit future crimes.

At every turn, Mr. Dovlatabadi has shown that he takes his conviction seriously. A sentence of Probation will serve as real punishment, deterrence, and accountability, while avoiding unwarranted disparities and allowing him to continue fulfilling his irreplaceable roles as a father, husband, son, caregiver, and mentor.

## II. Facts of the Case and Procedural Posture

On August 13, 2024, agents executed a search warrant at Mr. Dovlatabadi's residence in

Springfield, Virginia. The search was carried out while his three-year-old son was asleep in the home amplifying the collateral trauma to his family. His wife, already a trauma survivor, suffered renewed [redacted] for months. His reputation in his neighborhood and professional community was badly damaged, consequences that should not be ignored in assessing the proportionality of punishment.

During the search, the agents seized one assembled silencer and parts that could, if combined, would create [two additional silencers. These items were purchased online between January and April 2024 for approximately $435, some imported from China and mislabeled as "bike accessories" or "piston parts." None was registered in the National Firearms Registration and Transfer Record. Agents executing the search warrant did not seize any of Mr. Dovlatabadi's lawfully registered firearms or silencers, confirming the absence of broader misconduct.

His intention, as he had candidly admitted, was to assemble them at a later time and then **register** them properly, as he had done with other lawfully obtained suppressors and firearm accessories. In doing so, however, he failed to comply with the requirements of federal law which mandate registration, payment of a $200 tax stamp and a background check which he had **passed in the past**, prior to acquisition.

From the outset, Mr. Dovlatabadi accepted responsibility. On June 17, 2025, he waived indictment and pled guilty to a single count information pursuant to a plea agreement. The government never sought Mr. Dovlatabadi's detention and he has remained compliant with all the conditions of his pretrial supervision. He does not drink or use drugs and has not tested positive for either. He has maintained his employment while also working on the design of an app related to his first patent for mapping pharmaceutical medicine and alternative interventions

to help reduce risk to doctors and patients.

At the same time, Mr. Dovlatabadi has managed to continue his mentorship of over 7 young men in the local area and maintain his role as one of the founders of a college mentorship program that currently helps over 200 mentees while also assuming nearly full responsibility for his mother's care. Mr. Dovlatabadi has fulfilled his role as father, husband, and son while somehow also finding time to step into his brother's shoes as a provider for his niece and nephew since his brother's suicide less than two months ago. His conduct demonstrates a willingness to face the consequences of his actions with honesty, purpose, and humility.

## III. <u>Mr. Dovlatabadi's Background and Personal History</u>

Mr. Dovlatabadi's life is one of resilience when faced with hardship, service to others, and steadfast devotion to family. His personal history and characteristics are as compelling as they are unique.

### A. Childhood and Immigration

Mr. Dovlatabadi was born in Tehran during the Iran–Iraq War, a conflict that left his mother under constant bombardment while pregnant. He was delivered into an environment of instability and trauma. His family fled first to Hamburg, Germany, where they lived as refugees in extended-stay housing for two and a half years. In Germany, he and his brother endured daily bullying and social exclusion. His earliest school experiences were defined not by learning, but by the need to survive constant hostility. At home, things were no easier because his father, himself a product of abuse, used physical violence and verbal cruelty as his primary means of discipline. Mr. Dovlatabadi could not recall a single 30-day period in his childhood that did not involve some form of domestic violence.

The family immigrated to the United States after they were forced to leave Germany.

They moved to San Diego with the small amount of savings his father managed to accumulate from working manual labor jobs. Within the first six months, his father was defrauded in a business venture by an unscrupulous businessman who promised to make him a partner in a convenience store, leaving his family with no income or means of support.

His father went to work as a security guard, working a 60-hour week while also attending school. His mother worked as a babysitter until his father was accepted to pharmacy school in Birmingham Alabama. While they were in San Diego, Mr. Dovlatabadi and his brother sold clothes on weekends at local swap meets to make ends meet and struggled with instability, social ostracism, and poverty.

After moving to Birmingham, the family again struggled with poverty and persistent racism, particularly after September 11. In high school, Mr. Dovlatabadi was brutally assaulted and bullied, often requiring escorts between classes for his safety. He also continued to endure physical abuse at home. His brother moved to Florida during Mr. Dovlatabadi's last year-and-a-half of high school, leaving him alone to manage the household's emotional and financial burdens. These experiences did not define his character. Rather, they forged in him a commitment to education, work, and building a better life for others than what he had known.

The same emotional burdens proved too much for Mr. Dovlatabadi's older brother. Despite holding a master's degree and raising two children, his brother struggled with persistent mental health issues and less than two months ago, he took his own life.

**B. Education and Professional Achievements**

Against those odds, Mr. Dovlatabadi went on to earn a bachelor's degree in international studies from the University of Alabama followed by dual master's degrees in business and finance from Northeastern University. Along the way, he taught himself enough business

strategy and technology to start a small company at the age of 21 and earned seven advanced certifications – including Amazon Cloud Architect, Google Cloud Architect, Project Management Professional (PMP), and ITIL. He filed a patent related to pharmaceutical transparency and is currently completing a book on theology and civilization that he hopes to publish through academic channels.

Professionally, Mr. Dovlatabadi has risen to Vice President of Piedmont Global Language Solutions (PGLS), one of the largest language service providers in the country. His career has included innovation architecture at Fannie Mae, senior business consulting, and founding entrepreneurial ventures. As described by his employer, Mohamed Hussein, CEO of Piedmont Global Language Solutions:

> "[h]is work spans technical product development for law enforcement, the design of open-source intelligence infrastructure, and the operational build-out of key services that support refugees, veterans, and first responders. He also plays a central role in our nonprofit arm, PGLS Cares, helping us expand outreach, forge community partnerships, and deliver services in collaboration with organizations like The Young Marines, Translators Without Borders, and the National Language Service Corps." Exhibit 2K.

**C. Family—the Center of Mr. Dovlatabadi's Life**

Above all else, Mr. Dovlatabadi's role within his family reveals the core of his character. He has been married to his wife, Venus Rezvankhoo, since 2017. She is a former intensive care unit nurse who still struggles with [redacted] from a violent assault in her youth. The raid in this case, conducted while their then three-year-old son slept upstairs, reopened that trauma and has left lasting effects. As she wrote in her letter to the Court:

> "Saba is the backbone of our family. The raid and the uncertainty of this case pushed me back into months of [redacted]. Through it all, he has carried the weight — for me, for our son, and for his aging parents. He has already cut firearms entirely out of his life, because he never wants to place us in such fear again." Exhibit 2O.

Mr. Dovlatabadi is the sole provider for his family, including his son, [redacted], now four

years old and already learning three languages under his father's guidance. In his letter to the Court, Mr. Dovlatabadi describes the purposefulness he brings to his role as a father:

> "As a father, I am raising my son with presence and intentionality and he is already learning his third language. I've poured every ounce of energy into giving him a life defined not by fear or survival, but by structure, creativity, and love." Exhibit 1.

He is also the primary support for his aging parents. His father suffers from [redacted] and [redacted]; his mother has survived [redacted], and ongoing [redacted]. She suffers from acute [redacted] and now resides in Mr. Dovlatabadi's home because his father cannot provide the near full-time, in-home care her medical conditions require. Most recently, tragedy struck when his older brother died by suicide, leaving two children, ages 8 and 2, behind. Mr. Dovlatabadi has stepped in as a father figure to his nephew and niece, ensuring a source of continuity and stability in their lives. He communicates with them daily and has promised to be present when possible, for important events, and during times of need.

Sean Shabani, CEO of Purishh Supplements, describes Mr. Dovlatabadi commitment to his family as "profound."

> "He is a devoted husband and father to his young son, who is already showing the same intelligence, kindness, and character as his father. He supports not only his wife and son, but also his elderly parents, especially after the recent, tragic passing of his older brother." Exhibit 2Q.

That devotion to family is on full display in photographs of Mr. Dovlatabadi's family, attached as Exhibit 3.

For Mr. Dovlatabadi, these are not optional roles. They are obligations that no one else can fulfill. Incarceration would collapse the fragile balance he has worked tirelessly to maintain across three generations of his family.

**D. Community Service and Mentorship**

A measure of Mr. Dovlatabadi's character is the joy he finds in giving. Alongside family and career, Mr. Dovlatabadi has committed himself to mentorship and community service. He began mentoring troubled youth while he was still living in Birmingham. He co-founded the M2 Network in 2024, guiding more than 200 college students and young professionals. He consults for the Baltimore Board of Education and for schools like the Revival School and the Tanwir Institute, helping them expand into new markets and strengthen their curriculum.

Momen Abukhdeir, Chief Data Performance Officer and Baltimore County Chair for the Baltimore County Board of Education, describes his contributions to the County's educational programs as exemplary:

> "Mr. Dovlatabadi's contributions to our educational programs have been exemplary. His expertise, commitment, and dedication make him an exceptional candidate for any position that requires a profound understanding of educational needs and a commitment to student development. I cannot overstate how important it is to ensure Mr. Dovlatabadi is able to continue utilizing his extensive professional background to provide a positive impact to our Board. I rely on his expertise greatly in many domains ranging from personnel to programming, and hope to continue leveraging his skill set as we continue our mission of providing excellent quality education." Exhibit 2B.

Abrar Abukhdeir, Assistant Deputy Director of Operations for the Department of General Services for the City of Baltimore, described him as "deeply principled, endlessly generous, and genuinely selfless."

> "Saba is a pillar in every community he touches. Whether in crisis or in growth, he shows up with compassion, integrity, and a steady hand. I have rarely encountered someone so selfless in service to others." Exhibit 2A.

He also writes:

> " Saba has been one of the most important influences in my life…He has held me accountable when I needed it and believed in me when I didn't believe in myself." *Id*.

The testimony of those Mr. Dovlatabadi has mentored is even more compelling. For example, Officer Ibrahim Awwad, now a police homicide investigator and member of the Air

National Guard, credits Mr. Dovlatabadi with transforming his life.

> "Had it not been for Saba's mentorship when I was in high school, I would not be where I am today. He changed my trajectory entirely. He is my brother, my guide, and the reason I became a law-abiding man of service." Exhibit 2E.

Letters, from professionals, officers, educators, executives, and community leaders, tell a consistent story: that Mr. Dovlatabadi has devoted his life not to himself, but to lifting up others.

Niek Afzali is a lobbyist and consultant advising governments, leading organizations, and businesses and representing their economic interests. While not a person who easily speaks about his personal life, he felt compelled to write about the person he describes as "his friend at a time when he came to see people as inherently untrustworthy and evil,"

> "Saba gave me a reason to keep living and restored my belief that there are still good, loyal, trustworthy, and honest people in this world. My dear friend does not know this, but in many ways, he saved me from death. For that, I will always be grateful to him and will love him like a brother until the day I die." Exhibit 2C.

Sean Shabani is the CEO of Purishh Supplements and has known Mr. Dovlatabadi for over twenty-five years. He is one of Mr. Dovlatabadi's mentees who benefited from his guidance financially and in business, and who he says expected nothing in return.

> "When I was twenty-two and facing serious personal difficulties, Saba was there for me in ways that shaped the course of my life. He helped me secure my first apartment when I had limited means and no rental history, co-signed for me without hesitation, and supported me as I began building my independence. He not only helped me financially to start small business ventures, but more importantly, he taught me the values of honesty, responsibility, and fairness. Saba would always tell me that success should never come at the expense of others, and that principle has guided my own life ever since." Exhibit 2Q.

Omar Nassimi, yet another mentee, describes Mr. Dovlatabadi as being a steady presence in his life who had been "selfless, humble, and entirely focused on my best interests." He writes:

> " I have seen Saba extend this same generosity to others, consistently and quietly. Within different groups in Northern Virginia, his mentorship has strengthened careers, supported families, and helped launch businesses and community initiatives. Personally, the confidence I have gained through his counsel has given me the courage and practical roadmap to start my own venture. I would not be where I am today without his steady

mentorship." Exhibit 2L.

A final example, Omar Popal, Founder of the non-profit Tanwir Institute, sees him as "someone who embodies the values of service, humility, and dedication." He also writes:

> " Saba also devotes himself to mentoring the youth at Tanwir Institute, serving as both a professional role model and a source of inspiration. His guidance has positively impacted many young people, encouraging them to pursue excellence in both their careers and their character development." Exhibit 2N.

**E. Personal Accountability**

Mr. Dovlatabadi has accepted the Court's judgment and taken full responsibility for his conviction. As Mohamed Hussein, Mr. Dovlatabadi's employer, says:

> "Saba's conviction does not reflect the totality of who he is. I have known him to be a person of integrity, caution, and principle. His conduct throughout this process has been dignified, reflective, and filled with remorse. He has not shied away from accountability; he has leaned into it with the resolve to rebuild and serve." Exhibit 2K.

Many additional friends, professionals and mentees wrote letters on Mr. Dovlatabadi's behalf echoing many of the same sentiments as already described. See Exhibits 2A-2Q.

## IV. <u>The Sentencing Guidelines</u>

The advisory Guidelines and Criminal History are properly calculated in this case with a resulting advisory guideline range of 24 to 30 months. The base offense level under §2K2.1(a)(5) is 18 because silencers are included in the definition of "firearm" under the National Firearms Act (NFA). A two-level enhancement is added for the number of silencers.[2] Yet as the Court is aware from other firearms cases, the history of these Guideline provisions demonstrates that they are not tethered to the statutory purposes of sentencing in cases like this one.

[2] The six-level decrease for possession of a firearm solely for lawful sporting or collection purposes under § 5K2.1(b)(2) does not apply if the firearm is described in 26 U.S.C. § 5845(a) (i.e., a silencer), nor does the two-level decrease for a zero-point criminal history in § 4C1.1 for the same reason.

**A. The historical development of §2K2.1 is inconsistent and unaligned with the harms and reality of silencer use.**

When the Guidelines were first promulgated in 1987, the Sentencing Commission acknowledged that firearms cases encompass a "wide variety of circumstances" and emphasized two factors above all others: criminal history and intended use. At that time, a defendant like Mr. Dovlatabadi — with no criminal history and no intent to use silencers for crime — would have received substantial reductions. Under §2K2.2 of the 1987 Manual, his base offense level would likely have been 12 for an offense committed under 26 U.S.C. § 5861, increased by 4 levels if the firearm was a silencer, decreased by 6 levels if the firearm was possessed solely for sport, recreation or collection, yielding a range with acceptance of responsibility of 0 to 6 months.[3]

In 1989, the Sentencing Commission increased the base offense level for an offense committed under 26 U.S.C. § 5861 to 16, removed the four-point increase if the firearm was a silencer, added two levels for obliterated serial numbers, and left in place the six-point reduction for sporting or recreational use resulting in a total offense level of 10 before acceptance of responsibility for someone in Mr. Dovlatabadi's shoes[4] By 1991, the base offense level for an offense committed under 26 U.S.C. § 5861 had increased to 18 and enhancements for number of firearms had been added,[5] pushing even hobbyist or collector cases — like this one — into ranges more suited to traffickers and armed felons.

---

[3] *See* 1987 USSG Manual at A.27 (appendix directing guidelines for convictions under 26 U.S.C. § 5685 be calculated under one of three sections (§2K1.3, §2K1.6, §2K2.2), the most applicable here being §2K2.2).

[4] *See* 1989 USSG Manual §2K2.1, and *comment* 2.

[5] *See* 1991 USSG Manual §2K2.1

This inflation of offense levels has never been reconciled with empirical evidence. As scholars and even the ATF have recognized, silencers are rarely used in crime. They are legal in 42 states, including Virginia,[6] and commonly used for hunting and hearing protection.[7] NPR's review of ATF data found silencers "seldom used in crime," and criminological studies argue that silencer laws often ensnare hobbyists rather than professional criminals.[8] Yet under today's Guidelines, a first-time offender like Mr. Dovlatabadi, with no criminal history, can face the same range as a repeat trafficker of illegal machineguns.[9]

Recent legislative developments under President Trump reinforce the disconnect between current silencer laws and how often they are actually used in violent crime. On July 4, 2025, the President signed into law the "One Big Beautiful Bill," H.R.1, 119–21, title VII, § 70436(a), July 4, 2025, 139 Stat. 247, amending 26 U.S.C. § 5811(a) into law. Among its provisions is a zero-dollar tax stamp for silencers, short-barreled rifles, short-barreled shotguns, and "any other

---

[6] *See, e.g.,* https://www.silencershop.com/where-are-they-legal.

[7] While the Sentencing Commission ceased engaging with suppressors three decades ago, American legislatures have not. In 2017, H.R. 367 was introduced in the 1st Session of the 115th Congress. This bill, entitled the "Hearing Protection Act of 2017", proposed the striking of "silencers" from the definition of "Firearm" under the Internal Revenue Code of 1986. According to one sponsor, Rep. Jeff Duncan, R- S.C., "[t]his legislation is about safety — plain and simple … I can't tell you how better off the shooting sports enthusiasts would be if we had easier access to suppressors to help protect our hearing." *See* Rot, Nathan, *Debate Over Silencers: Hearing Protection Or Public Safety Threat?*, National Public Radio (March 21, 2017), available at: https://www.npr.org/2017/03/21/520953793/debate-over- silencers-hearing-protection-or-public-safety-threat.

[8] *Id.*

[9] Clark, Paul, *Criminal Use of Firearm Silencers*, Western Criminology Review, Ed. 8(2), 44–57 (2007), available at: https://www.westerncriminology.org/documents/WCR/v08n2/clark.pdf. This paper explains that the problems results from, among other reasons, "[s]ince one can effectively muffle a firearm by doing nothing more than wrapping it in a towel it is unlikely that laws banning professionally manufactured (or home- made) silencers are likely to have any real effect on crime."

weapons"—a significant departure from the original intent of the National Firearms Act. Though registration and background checks remain, the $200 barrier—an element of Mr. Dovlatabadi's offense—has been deemed excessive and removed. See 26 U.S.C. § 5811(a), Pub. L. 119–21, title VII, § 70436(a), July 4, 2025, 139 Stat. 247.

These developments reinforce a growing consensus—legislative, judicial, and scholarly—that the NFA's harsh historical framework has outlived its purpose for certain non-violent items like silencers and silencer parts. Likewise, of the 64,028 federal offenders tracked by the Commission who were sentenced in fiscal year 2024, 7,960 offenders were sentenced under §2K2.1. Of those 7,960, only 412 (roughly 5%) involved a firearm described in 26 U.S.C. § 5845(a), by a person who was not a prohibited person and who was not convicted under 18 U.S.C. §§ 922 or 924.[10] Mr. Dovlatabadi' is neither. Regrettably, his offense conduct, minor in both impact and intent, is tethered to a regulatory regime that neither aligns with current law nor reflects the risk associated with actual silencer use.[11]

**B. Courts in this district, including this Court, have acknowledged the firearms Guideline's disconnect with the purposes of sentencing by regularly imposing variant sentences, including noncustodial sentences.**

Courts in this district, and this Court in particular, look to the underlying conduct to determine the defendant's sentence and have found aggravating conduct to generally be the determining factor for imposing custodial sentences. For example, in *United States v. Hughes*,

[10] U.S.S.C., Use of Guidelines and Specific Offense Characteristics Guideline Calculation Based, Fiscal Year 2024; Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/guideline-application-frequencies/2024/Ch2_Guideline_FY24.pdf

[11] For example, "[i]n the ten-year period of this study, there were approximately 40,000 homicides prosecuted in federal court and considerably fewer than .01 percent involved a silencer." *Id*.

1:22-cr-239, this Court varied downward from 18-24 months to 4 months and 2 years' supervised release where a retired Marine possessed and sold multiple fully automatic AR-style rifles via Facebook Messenger. Not only did the defendant possess an unregistered AR-9 machinegun; he participated in the machinegun conversion process. In *United States v. Jamshidi*, 1:22-cr-233 (MSN), a military officer purchased an M16-type 5.56mm NATO caliber machine gun without a serial number from an individual who converted and sold fully automatic weapons, lied to ATF agents, and still received probation with three months of home confinement. The defendant faced a guideline range of 18-24 months. And in *United States v. Nichols,* 1:18-cr-469 the defendant manufactured and sold AK- and AR-style rifles, the Court imposed probation with four months intermittent confinement. Similarly, in *United States v. Rodriguez,* 1:22-cr-30,a retired Marine sold multiple converted machineguns. The defendant faced a guideline range of 24-30 months, yet this Court imposed a sentence of two years probation and three months of home confinement.

Most tellingly, in *United States v. Bennett,* 1:24-cr-74 the defendant was caught with **19 unregistered silencers imported from China and 10 3D-printed auto sears** — conduct far more aggravated than in this case. The government calculated a guideline range of 46–57 months but recommended "an appropriate sentence." Considering both the aggravating and mitigating factors, the court imposed a sentence of probation with conditions, highlighting the disconnect between the advisory range and the statutory purposes of sentencing. Courts around this country have come to similar conclusions.[12]

---

[12] *See, e.g., U.S. v Ridenour, et. al.,* 1:22cr20031 (E.D. Mich 2022) (sentencing defendant Nick Logan to three years' Probation where Logan had worked for a company illegally selling thousands of components and referred to the suppressors as "solvent traps" to avoid law enforcement detection; the codefendant who manufactured and tested the suppressors for sale received 12 months and a day of incarceration); *U.S. v. Cox, et. al*., 6:15cr150 (D. Kan. 2017)

## V. The Goals of Sentencing Are Achieved by a Sentence of Probation

### A. Mr. Dovlatabadi poses little risk of recidivism.

Of all the purposes of sentencing, the need to protect the public from further crimes of the defendant is one of great practical concern and is the most capable of being measured. Mr. Dovlatabadi does not fit the model of a person who will commit new criminal offenses or is likely to recidivate. And, because of the reinvigorated role of the judiciary in sentencing, judges can now impose sentences that take such research into consideration to more effectively impose sufficient, but not greater than necessary, sentences.

The judiciary's bolstered role is especially important given the Commission's own findings that "there is no correlation between recidivism and Guidelines' offense level. Whether an offender has a low or high guideline offense level, recidivism rates are similar. While surprising at first glance, this finding should be expected as the Guidelines' offense level has long been recognized as "[n]ot intended or designed to predict recidivism." *U.S. Sentencing Comm'n, Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines* at 15 (May 2004) (hereinafter *Measuring Recidivism*).[13] Thus, the Guidelines are at odds with 18 U.S.C. § 3553(a)(2)(C), and *Booker* has freed the judiciary to remedy this inconsistency.

This experience has taught Mr. Dovlatabadi a valuable life lesson to ensure he does not repeat the mistakes of the past. However, without even considering the

(sentencing codefendants to two years' Probation where they had operated a conspiracy to manufacture and sell suppressors).

[13] Available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_First_Offender.pdf

circumstances of the offense, there is, quite simply, nothing in the record to make this Court believe that Mr. Dovlatabadi would commit any criminal offense in the future.

**B. The Need to Avoid Unwarranted Sentence Disparities Among Similarly Situated Defendants.**

The Court must consider the need to avoid unwarranted sentence disparities among defendants with similar criminal histories convicted of similar criminal conduct. *See* 18 U.S.C § 3553(a)(6); *see also United States v. Reyes*, 207 F. App'x 327, 329 (4th Cir. 2006); *United States v. Laporte*, No. 4:19-cr-8, 2024 U.S. Dist. LEXIS 208281, at *12 (E.D. Va. Nov. 15, 2024) (courts have a duty to "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct").

As seen below, a sentence other than a non-custodial sentence in Mr. Dovlatabadi's case would create an unwarranted disparity with other defendants found guilty in this district under the same statute who received probation where the court found aggravating factors such as converting and selling fully automatic weapons or some distinct underlying offense.

| Defendant | Case No. | Charge(s) | Guideline Range | Conduct Summary | Aggravating Factors (Detailed) | Final Judgment (Sentence) |
|---|---|---|---|---|---|---|
| **Dmitriy Minin** | 1:21-cr-00054-MSN | Receiving/Possession of Unregistered Firearms (§5861(d)) | 30–37 months | Imported ~12 silencers from China; shipping documents falsified | • **Used falsified manifests** to sneak items through customs = deliberate deception.• **Pattern of importation** (not one-off).• Quantity of silencers above "personal-use" level. | **3 Years Supervised Release** (time served until sentencing) |
| **Marcus Rodriguez** | 1:22-cr-30-MSN | Possession of Machineguns (§922(o)) | 24–30 months | Converted 4 rifles into fully automatic weapons; sold 3 (2 to UC ATF agent, 1 to civilian); one unrecovered | • **Multiple MG conversions and confirmed sales.**• **One MG not recovered**, raising public-safety concerns.• Deliberate, repeated conduct — not isolated.• Sales included undercover ATF, showing trafficking risk. | **2 Years Probation** with **3 months home confinement + mental health treatment** |
| **John C. Nichols** | 1:18-cr-469-TSE | Unlawful Making of a Firearm (§5861(f)) | 24–30 months (OL 17, CHC I) | Built & sold ghost guns and short-barreled rifles (AR/AK types); ran a small operation | • **Manufactured ghost guns** with no serial numbers.• **Trafficked multiple firearms** (not one-off).• **Interstate element** (sold across state lines).• DOJ described this as a **trafficking pattern**. | **3 Years Probation** with **4 months intermittent confinement** |
| **Ehsan Jamshidi** | 1:22-cr-233-MSN | Possession of a Machinegun (§922(o)) | 24–30 months | Purchased M16-type MG; initially lied to ATF | • **Actual military-grade machinegun** (M16-type).• **Initial dishonesty to ATF** when questioned.• Court noted seriousness of lying after Miranda. | **2 Years Probation** with **3 months home confinement + 200 hrs community service** |
| **Trashawn Newsome** | 2:23-cr-36-AWA | Possession of a Machinegun (§922(o)) | 37–46 months (OL 21, CHC I) | Glock w/ auto sear, 120g marijuana, oxycodone, cash, scale; arrested after fentanyl overdose | • **Machinegun + narcotics combo** elevated seriousness.• **Loaded extended magazine** increased lethality.• **Cash, scale, baggies** = classic intent-to-distribute indicators.• **OD on fentanyl** before plea suggested instability and danger to self. | **Time Served + 3 Years Supervised Release** with **24 months home detention + 200 hrs community service** |
| **Paul J. Hughes** | 1:22-cr-239-MSN | Possession of a Machinegun (§922(o)) | 18–24 months | Sold 2 converted MGs via Facebook; admitted drilling "third hole" | • **Multiple confirmed sales** of MGs into community.• **Used social media** to arrange illegal transfers, showing brazenness.• **Technical knowledge** of firearm conversion, including drilling the "3rd hole."• DOJ highlighted him as a "firearms expert" misusing knowledge. | **4 Months (intermittent) Imprisonment + 2 Years Supervised Release** |
| **Matthew Rogers** | 1:22-cr-192-MSN | Unlawful Transfer/Possession of Machinegun (§922(o)) | 18–24 months | Made homemade auto sear; bought 4 more online; gave 1 to another; attempted to sell rifle he described as "illegal for 3 reasons lmao" | • **Attempted distribution** of MGs (transfer of at least 1).• **Boogaloo Bois extremist ties** flagged by DOJ.• **Public mocking of federal law** (social media caption).• Conduct suggested **anti-government posture** with dangerous ideology overlay. | **3 Years Probation** with **6 months home detention + 200 hrs community service** |
| **Ronald Bennett** | 1:24-cr-74 MSN | Possession of an Unregistered Firearm (26 U.S.C. § 5841, 5845(a)(7), 5861(d), 5871)<br><br>Possession of a Machinegun (18 U.S.C. § 922(o), 26 U.S.C. § 5845(b)) | 46–57 months (OL 23, CHC I) | Imported 19 Chinese silencers; 3D-printed 10 auto sears (conversion devices) | • 19 silencers + machinegun parts.• **Foreign importation**.• 10 manufactured **Auto sears** designed solely to convert to MGs.• ATF confirmed they were functional silencers.. | **3 Years Probation + Home Detention**【Bennett Position / Judgment】 |

In each of these cases, judges in this courthouse, including this Court, weighed the case-specific factors and determined Guideline sentences to be wildly inappropriate. And, with one exception involving four months of intermittent imprisonment, the same courts found that sentences of probation or time served with supervised release satisfied the statutory purposes of sentencing – just punishment, deterrence, protecting society, and rehabilitation. The case specific facts and statutory purposes of sentencing equally call for a sentence of probation in Mr. Dovlatabadi's case.

**C. Mr. Dovlatabadi's public shaming and the consequential consequences of his conviction serve as adequate deterrence to others.**

Section 3553(a)(2)(B) requires the Court to consider "the need for the sentence imposed to afford adequate deterrence to criminal conduct." There is no need for personal deterrence in this case, as Mr. Dovlatabadi is a zero-point offender and is among the least likely individuals to commit further crimes in the future. The Commission was clear that "[r]ecidivism data analyzed by the Commission shows, however, that offenders with zero criminal history points have considerably lower recidivism rates than other offenders, including offenders with one criminal history point."[14]

Mr. Dovlatabati's arrest and conviction have been defining moments in his life. Arguably, the government already achieved the maximal deterrent effect of Mr. Dovlatabadi's offense simply by charging and convicting him. As a result, his offense will be discussed in various settings among family and friends and will have consequences within his professional

[14] United States Sentencing Commission, *Amendments to the Sentencing Guidelines*, at 79 (adopted April 27, 2023; effective November 1, 2023) (available at: https://www.ussc.gov/sites/default/files/pdf/amendment-process/reader-friendly-amendments/202305_RF.pdf).

environments for years to come, a shameful reality from which he simply cannot escape. His household is currently a single income household; his wife, son, and now his mother, are solely dependent on his ability to work for all of their current living. At PGLS, he is working on an Artificial Intelligence and interpretation platform for the DOJ and the Bureau of Prisons that analyzes depositions, bodycam footage, and phone calls which helps transcribe, translate, and decipher between individuals. This requires him to be involved in every aspect of client requirements, customer interfacing, and implementation consultation with the technical teams that exposes him to sensitive information. His felony conviction has already dramatically impacted his position by excluding his participation in certain current and future work.

In short, Mr. Dovlatabadi's public and professional shaming sends a strong message to anyone who might attempt such conduct in the future.

## VI. <u>CONCLUSION</u>

Mr. Dovlatabadi accepted responsibility for his crimes. He pleaded guilty and fully appreciates that he violated the law. While there is no question of guilt, there is also no allegation that he ever used the illegal silencers or silencer parts, or any of his legally possessed firearms or silencers in a dangerous or unlawful way. However, he will never be able to own a firearm again and his wife, who still suffers from [redacted], can no longer keep the taser she never left the house without at their home.

In light of the above, Mr. Dovlatabadi respectfully requests that the Court impose a sentence of probation.

Dated: September 5, 2025

Respectfully submitted,

SABA DOVLATABADI
By Counsel

/s/____________________
Nina J. Ginsberg, Esquire
Virginia State Bar No. 19472
Greenspun Shapiro Ginsberg & Yang PC
3955 Chain Bridge Rd., Fl. 2
Fairfax, VA 22030
Phone: (703) 352-0100
Fax: (703) 591-7268
Email: njg@greenspunlaw.com

*Counsel for Defendant*

**CERTIFICATE OF SERVICE**

I hereby certify that on the 5th day of September, 2025, I will electronically file the foregoing with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to counsel of record.

/s/___________
Nina J. Ginsberg